NATIONAL GUERNSEY DAIRY, INC., Appellant, vs. DEPART-
MENT OF AGRICULTURE AND MARKETS, Respondent.

*May 12—September 12, 1939.*

For the appellant there were briefs by *A. B. Weller,* attorney, and *Byron J. Hays* of counsel, both of Milwaukee, and oral argument by *Mr. Hays.*

For the respondent there were briefs by the *Attorney General* and *R. M. Orchard,* assistant attorney general, attorneys, and *Fred M. Wylie* of Madison of counsel, and oral argument by *Mr. Wylie* and *Mr. Orchard.*

The following opinion was filed June 30, 1939:

MARTIN, J.    Certain facts which are not in dispute will be referred to in connection with the material findings made

by the department. It appears that for some time prior to January 7, 1937, one Charles Boomsma, as a sole trader, operated a retail dairy business in Racine, under the trade name and style of "South Side Dairy." In 1936 his license was revoked. Soon thereafter a corporation was formed, known as "South Side Dairy, Inc." One L. C. Christiansen was one of the incorporators and became the principal owner of South Side Dairy, Inc. The corporation purchased the business theretofore owned and conducted by Boomsma. After the corporation was organized, and the purchase made, Boomsma had no connection with South Side Dairy, Inc. While Boomsma operated the dairy in 1935 and 1936, L. C. Christiansen sold him milk from several farms then owned or controlled by Christiansen, at less than minimum ordered prices. After South Side Dairy, Inc., purchased Boomsma's dairy business, it conducted its dairy business in the same plant, continued to employ the same personnel, and sold milk at less than the ordered minimum price fixed by the department. It also underpaid producers, due in some instances to clerical errors and, in others, to a failure to follow the department's instructions. During the first eight months of 1938 the corporation showed an operating loss of $1,242.34. The application of South Side Dairy, Inc., for a 1938 dealer's license was denied by the department on the ground that applicant was unfit and unequipped for the business of a dealer under sec. 100.03, Stats. Action was brought by the dairy company in the circuit court for Dane county, for a review of the order denying its 1938 license. The department answered, but the action was not brought on for hearing. South Side Dairy, Inc., continued to operate throughout the year 1938, during all of which time the aforesaid action was pending in the circuit court.

The facts thus far stated are either conceded or are found by the department and sustained by the evidence. We now approach matters relating to the denial of the 1939 license,

and what we shall refer to as the reorganized company, with a changed capital setup, stock control, and new personnel as to all officers and directors of the appellant corporation. In this connection we will quote in full the findings made by the department, 9 to 16, inclusive:

"9. Suit was commenced by the South Side Dairy, Inc., to review the order denying 1938 license, but said action did not suspend the order of denial nor operate to license the said company.

"10. Nevertheless, the said dairy company continued to operate as a dealer under section 100.03 of the statutes without license, and to violate the statute and market orders in the same particulars set forth in the findings upon which 1938 license was denied, and was so operating at time of hearing December 13, 1938, and was so violating at least until November, 1938.

"11. The corporate name of applicant was changed, first to Golden Guernsey Dairy, Inc., in improper imitation of the national Golden Guernsey brand, and then to National Guernsey Dairy, Inc., in close imitation of the national Golden Guernsey brand and calculated to mislead the public as to the brand of milk handled by applicant.

"12. The capital stock setup was changed, but with a preponderant proportion of preferred stock, with cumulative dividends (amounting and to amount to considerably more than the subscribed common stock, and several times the paid common stock), issued and to be issued to L. C. Christiansen, with a provision for voting rights in said preferred stock when five years in arrears on dividends. L. C. Christiansen subscribed for forty-nine per cent of the common stock, and paid for about the same percentage of the issued or immediately to be issued common stock, with no restrictions on the transfer of any of the common stock, so that issue or transfer of two or three shares of common stock to L. C. Christiansen would give him voting control, besides his potential influence in the corporation by the ownership of preferred stock. Virtually all of the milk being received is from farms owned by L. C. Christiansen and from herds either owned by L. C. Christiansen or upon which he has chattel mortgage, and the payments for milk go through his hands.

"13. The present manager, Henry Berns, subscriber for fifty-one per cent of the common stock and in present control of about that percentage of the issued or immediately to be paid for and issued common stock, operated the business from September 1, 1938, with knowledge of the denial of license, and at least until November, 1938, knowingly in violation of the statutes and the market order by selling milk below the ordered minimum price.

"14. The company operated during 1938 at a loss of about $200 a month, and although the reorganization apparently eliminated the deficit, it was to provide only about $2,000 working capital from sale of common stock, and unsecured subscriptions for $3,000 additional common stock. There was failure to make promised proof of responsibility of the subscribers. This affords too narrow a margin of financial assurance of prompt payment to producers in view of the previous 1938 operating deficit of about $200 per month.

"15. The applicant is employing as drivers, who act also as salesmen and collectors, four persons who have been active parties to violations of the statute and the market order by selling milk over a long period at prices below minimum ordered prices.

"16. The applicant is unfit and unequipped by reason severally of each of the foregoing matters, for the business of a dealer under section 100.03 of the statutes."

It appears that on or about September 1, 1938, one Henry Berns, who later in 1938 acquired a controlling stock interest in the appellant company, and thereafter became president and general manager of said company, came in contact with the South Side Dairy, Inc., through responding to an advertisement. Prior to this time he was not acquainted with Mr. L. C. Christiansen, then the principal and controlling owner of South Side Dairy, Inc. Mr. Christiansen explained to him the difficulties which the South Side Dairy, Inc., had experienced, the fact that its application for a 1938 license had been denied, and that litigation was then pending in the circuit court for Dane county, seeking a review of the department's order denying the 1938 license. Berns was a man of many years' experience in the dairy business which he had successfully operated over a long period of years prior to

1930. Berns became interested in the future prospects of the South Side Dairy, Inc., and was willing to become financially interested, providing he could get complete control, change the capital structure, and systematize the business in accord with what he regarded as proper business methods. It appears that through September and October, 1938, he was principally concerned in proposing and effectuating reorganization plans which were not fully completed until late in October, 1938. He proposed amending the articles of organization, decreasing the capital stock from $25,000 to $18,000, divided into three hundred twenty shares of preferred stock at $25 a share and four hundred shares of common stock at $25 per share, increasing the number of directors from three members to five, and also changing the corporate name. There was also an amendment to the articles changing the voting rights of preferred stock so as to allow it voting rights in case of default of ten dividend payments. It appears that this latter amendment as to voting rights of preferred stock was made at the suggestion of the department. While Mr. Berns was engaged in his reorganization plans, and setting up a new system of records so that he might be able to keep an accurate check as to the purchase and sale of dairy products and the business in general, the department had some of its accountants audit the books of the corporation and check its records. In this connection, under date of October 31, 1938, Mr. Loeser, a department accountant, wrote to his superior in the department, Mr. L. G. Kuenning, in charge of milk control, in part as follows:

"Dear Mr. Kuenning:

"Re: *South Side Dairy, Racine, Wisconsin.*

"Fred Myhre and I audited the books of the above-mentioned dairy for the period of March, 1938, through September, 1938.

"The condition of the records through August was just fair—not entirely satisfactory. *Records are set up by Mr. Henry Berns, prospective new manager for the dairy, were excellent,* and we checked September on this new system. One of the unsatisfactory practices under the old

system was the issuing of one check to Mr. L. C. Christiansen, who then satisfactorily paid the individual shippers, who are renters of his. Mr. Christiansen promised that in the future individual checks would be issued to shippers, and if necessary, Mr. Christiansen would secure assignments from the shippers against these checks. . . ."

Appellant company filed its application for a 1939 license in the fore part of December, 1938. If the department had a right to consider the former violations back in 1935 and 1936, while Boomsma operated the dairy under the trade name and style of "South Side Dairy," or while the business was thereafter operated by "South Side Dairy, Inc.," the findings of the department would have to be sustained and the judgment affirmed. However, we are of the view that there is no evidence to sustain the department's finding that the appellant company,—the reorganized company, is unfit and unequipped for the business of a dealer under sec. 100.03, Stats. There is no basis even for an inference that the reorganization under Berns' control and management was not made in good faith. In fact, it is conceded that the department to a certain extent conferred with and advised Berns with respect to some of the plans of reorganization after he had acquired the controlling stock. No contention is made that Berns' purchase of a controlling interest in the company and the reorganization which followed were a mere "cover up" of the violations of former years under different control and management. To lay at the door of the reorganized company the violations of the former owner would indeed be arbitrary, unreasonable, and unjust. To so hold would deprive Berns of the right to conduct a legitimate business, a business in which he was successfully engaged according to the uncontradicted evidence from 1896 until 1930. In 37 C. J. p. 240, § 97, it is said:

"The power vested in the board or officer to grant licenses upon the applicant complying with the prescribed conditions, unless mandatory in terms, carries with it, either expressly

or impliedly, the power of exercising, within the limits prescribed by the act or ordinance, a reasonable discretion in granting or refusing licenses. *But this discretion must be exercised reasonably, and not arbitrarily,* and furthermore arbitrary power in this respect ordinarily cannot be conferred on such board or officer."

In the recent case of *Matter of Elite Dairy Products v. Ten Eyck,* 271 N. Y. 488, 492, 3 N. E. (2d) 606, the court said :

"The statute forbids any person from engaging in business as a milk dealer without a license. That business is subject to reasonable regulation to promote the public welfare and the power of the state to require that all persons who engage in that business shall be licensed is not now challenged. Nevertheless prohibition of a right to engage in a lawful business may not be arbitrary, and conditions imposed must be reasonable."

The twelfth finding relates to the financial structure of the reorganized company. The finding as a whole seems to indicate some apprehension as to the possibility that at some future time through stock purchase, Mr. Christiansen might obtain control of the company. That is neither a matter for the department or the court to speculate on. Under the reorganized setup, Christiansen is a minority stockholder. We must deal with the present situation under Berns' control and management. The finding with reference to the financial responsibility of the appellant company is not sustained by any credible evidence. It is true that South Side Dairy, Inc., prior to the reorganization, operated at a loss during a part of 1938. Upon the reorganization all of the debts of South Side Dairy, Inc., were paid in full. All of the physical assets of the corporation were transferred to the reorganized company, and preferred stock was issued to Christiansen of the value of the physical assets so transferred. As of December 13, 1938, being the date on which appellant applied for a 1939 license, the company had no outstanding bills and

something over $2,000 in cash on hand. There is no evidence that appellant was not promptly meeting its obligations to its milk producers. If the department entertained any doubt in this regard, it had the right to require appellant to file with it a surety bond, conditioned for the prompt delivery of the price to producers under par. (d) of sub. (4) of sec. 100.03, Stats. The department made no finding as to the net worth of appellant company. Pars. (c) and (d) of sub. (4) of sec. 100.03, provide:

"(c) The department shall issue license to each person making proper application and who is *fit and equipped* for the business. License may be denied, suspended or revoked by special order after notice and hearing as provided in section 93.18, when the applicant or licensee is *unfit or unequipped* for the business.

"(d) Under paragraph (c) the department shall consider, in addition to other matters, the character and conduct, including past compliance or noncompliance with law, of the applicant or any person to be connected with the business, and the financial responsibility of the applicant. The department may at any time require an applicant or licensee to file with it a surety bond conditioned for the prompt delivery of the price to producers."

The fourteenth finding refers to the financial loss of the South Side Dairy, Inc., during its 1938 operations; also refers to the financial structure of the reorganized company. As to the latter, the finding concludes:

"Although the reorganization apparently eliminated the deficit, it was to provide only about $2,000 working capital from sale of common stock, and unsecured subscriptions for $3,000 additional common stock. There was failure to make promised proof of responsibility of the subscribers. This affords too narrow a margin of financial/assurance of prompt payment to producers in view of the previous 1938 operating deficit of about $200 per month."

What is said above with reference to finding No. 12 is applicable to finding No. 14.

The eleventh finding relates to the corporate name of appellant company. The department finds that the name "National Guernsey Dairy, Inc.," is in close imitation of the national Golden Guernsey brand and calculated to mislead the public as to the brand of milk handled by applicant, but there is no evidence that any member of the public was misled. The adoption of said corporate name is not in violation of the law. Appellant had the right to adopt such corporate name as it saw fit provided that the name did not conflict with that of any other corporation theretofore adopted and of record in the office of the secretary of state. It was not a misbranding of the milk product.

The only material part of the thirteenth finding is that Mr. Berns:

"Operated the business from September 1, 1938, with knowledge of the denial of license, and at least until November, 1938, knowingly in violation of the statutes and the market order by selling milk below the ordered minimum price."

According to the uncontradicted evidence, the reorganization of the old company was not completed until November 1, 1938. While it is true that his connection dates from about September 1, 1938, the evidence conclusively establishes that the reorganization plans were carried on through September and October, 1938. The letter of October 31, 1938, from an auditor of the department to his superior in the department in charge of milk control, states:

"Records are set up by Mr. Henry Berns, *prospective new manager* for the dairy, were excellent, and we checked September on this new [Berns] system."

The fifteenth finding relates to the employment by appellant of certain drivers who were employed by the old company, who also acted as salesmen and collectors, and who were active parties to violations of the statute and market orders while in the employ of the old company. However,

there is no finding that these drivers were guilty of any violations after the reorganization under the new control and management. The testimony is without dispute that after the reorganization was perfected with new directors and officers in charge, Berns gave positive orders to all employees to strictly comply with the laws and orders of the department. There is no finding of any violations thereafter. As its conclusion in the instant case the department found:

"If prospective ability promptly to pay producers stood alone, the department would endeavor to have further payments made upon the common stock subscriptions or to have furnished a bond under sec. 100.03 (4) (d) of the statutes. However, the applicant being unfit and unequipped for the business of a dealer under sec. 100.03 of the statutes by reason of each of the matters set forth in the foregoing findings, and particularly by reason of the potential and actual influence of L. C. Christiansen, as stockholder and as producer, and in the handling and control of payments to producers, and the case with which L. C. Christiansen could come into actual voting control of the applicant, the application of National Guernsey Dairy, Inc., for 1939 dealer license under sec. 100.03 of the statutes should be denied."

There is not a word of evidence in the record,—in fact, there is no finding,—that the appellant company did not promptly meet its obligations to its milk producers. Its financial ability is further evidenced by the fact that the department never asked it to furnish a bond under sec. 100.03 (4) (d), Stats. So far as the evidence discloses, since the reorganization there has been no occasion to call for further payments on subscriptions to the common stock. That part of the conclusion that applicant is unfit and unequipped for the business of a dealer must necessarily rest upon the findings as to violations prior to the reorganization and prior to Berns obtaining control of the business. It is evident from the language of the conclusion that same is particularly based upon some future action of Christiansen either as a stock-

holder or producer. Findings of fact cannot be based on future possibilities.

We are of the opinion that the evidence does not support the finding and conclusion that appellant was "unfit and unequipped" for the business of a dealer, financially or otherwise. The judgment confirming the findings and order of the department must be reversed.

*By the Court.*—Judgment reversed, and record remanded for further proceedings in accord with this opinion.

FRITZ, J., dissents.

A motion for a rehearing was denied, without costs, on September 12, 1939.